# In the United States Court of Federal Claims

**No. 07-513C**
**(Filed Under Seal December 7, 2007)**
**(Reissued December 13, 2007)[1]**
**Bid Protest**

* * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| **THE CENTECH GROUP, INC.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Preaward Bid Protest; Judgment** |
| **v.** | * | **on the Administrative Record; Limitations** |
| | * | **on Subcontracting Clause, FAR 52.219-** |
| **THE UNITED STATES,** | * | **14; Corrective Action; Government** |
| | * | **Accountability Office; Injunctive Relief;** |
| **Defendant,** | * | **Bid and Proposal Preparation Costs;** |
| | * | **Remand.** |
| **and** | * | |
| | * | |
| **TYBRIN, INC.,** | * | |
| | * | |
| **Intervenor.** | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

Kenneth A. Martin, Martin & Associates, 6723 Whittier Avenue, Suite 200, McLean, VA 22102, for Plaintiff.

Arlene P. Groner, U.S. Department of Justice, Civil Division, Commercial Litigation Branch,1100 L Street, NW, Room 7024, Washington, D.C. 20530, for Defendant.

John S. Pachter, Jonathan D. Shaffer, and Mary Pat Gregory, Smith Pachter McWhorter PLC, 8000 Towers Crescent Drive, Suite 900, Vienna, VA 22182, for Intervenor.

---

## OPINION AND ORDER GRANTING IN PART DEFENDANT'S AND INTERVENOR'S MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

---

**WILLIAMS**, Judge

[1] On December 3, 2007, the Court held oral argument in this action. This opinion was issued under seal on December 7, 2007. The Court invited the parties to submit proposed redactions by December 12, 2007. The opinion issued today incorporates the parties' proposed redactions. This redacted material is represented by brackets "**[ ]**."

In this bid protest, Plaintiff, the Centech Group, Inc. (Centech), challenges the Air Force's de facto rescission of its services contract and its decision to reopen discussions and solicit revised proposals -- corrective actions the Air Force took to implement a recommendation by the Government Accountability Office (GAO) in a protest filed by Tybrin Corporation (Tybrin).[2] This procurement was a small business set-aside, and Tybrin contended in the GAO protest that Centech failed to comply with the Limitations on Subcontracting (LOS) clause, Federal Acquisition Regulation (FAR) 52.219-14, which requires that a small business perform at least 50 percent of the labor cost using its own employees, as opposed to those of its subcontractors.

In a Policy Memorandum provided to offerors, the Air Force misinformed offerors that compliance with the LOS clause's 50 percent requirement could be achieved collectively by small business members of an informal joint venture or by a small business prime and first-tier subcontractor. Two of the four offerors, including Centech, relied upon this mistaken direction in formulating their proposals. Centech offered to perform less than 50 percent of the labor costs using its own personnel.

Centech won the original award, but Centech's purported compliance with the LOS clause under the Air Force's mistaken Policy Memo ignited bid protest proceedings at the GAO and a Certificate of Competency (COC) determination at the Small Business Administration (SBA). Although the SBA determined that Centech could comply with the LOS clause and found Centech to be a responsible small-business offeror, GAO deemed compliance with the LOS clause to be a matter of proposal acceptability, not responsibility, and found that Centech's proposal did not meet the 50 percent requirement. Recognizing that Centech had understood its proposal would comply with the LOS clause due to the Air Force's flawed Policy Memorandum, GAO found that Centech had been deprived of meaningful discussions. GAO therefore recommended that the agency reopen discussions, reevaluate proposals and make a new source selection decision.

In response to GAO's recommendation, the Air Force issued Amendment 3 to the solicitation requesting revised proposals. All four offerors, including Centech, submitted revised proposals on July 31, 2007, and these proposals are currently being evaluated. The Air Force intends to make an award in April, 2008.[3]

---

[2] Tybrin, the incumbent contractor, is an intervenor in this action. In a decision issued publicly on September 25, 2007, the Court granted Defendant's and Intervenor's motions to dismiss in part concluding that this Court lacks jurisdiction to review GAO's recommendations or procedural rulings as an appellate-type tribunal. However, the Court recognized that under Honeywell Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989), it is appropriate for this Court to consider the rationality of GAO's determination where the agency relied upon such determination in taking the corrective action at issue.

[3] The Air Force has committed that it will not make an award before the Court renders a decision in the instant protest. Plaintiff did not seek to enjoin the submission of revised proposals or the evaluation of such proposals pendente lite.

This matter comes before the Court on the parties' cross-motions for judgment on the Administrative Record. Plaintiff asks this Court to reinstate its original award and declare that the Air Force's decision to follow GAO's recommendation and take corrective action was arbitrary and capricious.[4] Plaintiff contends that compliance with the LOS clause was not required to be evaluated as a condition for award under the original solicitation, but instead should have been examined after award once the Air Force's actual requirements were defined and the costs of performance of the labor by the prime and subcontractors could be ascertained. Thus, in Plaintiff's view, its proposal was acceptable and, once SBA determined it to be responsible, it deserved the award.

Applying the deferential abuse of discretion standard, the Court concludes that the Air Force's corrective action was not arbitrary, capricious, or in violation of law or regulation, and that no injunctive or declaratory relief is warranted. Plaintiff's proposal violated both the Small Business Act and the LOS clause because Plaintiff did not offer to perform 50 percent of the personnel costs itself. The fact SBA determined Centech to be responsible and capable of performing 50 percent of these costs itself, based upon information outside Centech's proposal, does not alter this conclusion. Because Centech relied upon the Air Force's erroneous interpretation of the LOS clause in submitting its original proposal, GAO properly determined that discussions should be reopened to allow Centech and the other offerors to revise their proposals to comply with the LOS clause as properly interpreted. As such, Centech is not entitled to reinstatement of its original award.

That is not to say, however, that no relief whatsoever could be forthcoming. The Air Force admitted that it erred in issuing its Policy Memorandum which erroneously notified offerors that they could comply with the LOS clause on a collective basis with their subcontractor small businesses. Due to its reliance on this erroneous directive, Centech may be entitled to recover some of its bid and proposal preparation costs, if it can demonstrate that such costs were wasted. As such, the Court remands this matter to the Air Force for its consideration of Centech's claim for bid and proposal preparation costs.

## Findings of Fact[5]

### The Solicitation

Over two and-a-half years ago, on February 28, 2005, the Air Force issued request for proposals (RFP) number FA9300-04-R-0040 for advisory and assistance services to support the Aerospace Research, Development, Test and Evaluation Activities (ARDTEAS) at the Air Force Flight Test Center at Edwards Air Force Base in California. AR, Tab 4 at 000151.

---

[4] Specifically, Plaintiff asks the Court to enjoin the Air Force from expending any funds for the subject services except under the contract originally awarded to Centech.

[5] These findings of fact are drawn from the Administrative Record.

The RFP provided for the award of a "hybrid" cost reimbursement and fixed-price contract depending upon the service being provided. Specifically, the RFP sought advisory and assistance services on a cost-plus-award-fee basis, direct costs such as travel and materials on a cost reimbursement basis, and phase-in services on a fixed-priced-award-fee basis. Award was to be made to the proposal offering the best value considering four evaluation factors: (1) Mission Capability, (2) Proposal Risk, (3) Past Performance, and (4) Cost/Price. The RFP was a 100 percent set-aside for small business concerns.

**The RFP's Performance Requirements Document**

In general, the solicitation's performance requirements document (PRD) described tasks to be performed by the successful contractor including "assistance with business management in support of ground test, flight test and other associated test and support activities," the support of "all phases of acquisition from identification of needs through contract performance," as well as the provision of systems engineering and technical assistance "required to support ground and flight test and related activities." AR, Tab 4 at 000230-36. The PRD listed three primary categories of services to be provided -- "Management and Professional Services," "Studies, Analyses, and Evaluations," and "Engineering and Technical Services," each with numerous specific tasks -- in total over 100 specific tasks. AR, Tab 4 at 000230-36.

In Paragraph 3.5 of the PRD, the Air Force disclosed:

> It is contemplated that variations in workload during the contract period will occur resulting in additions and reductions in manpower necessary to support mission requirements.

AR, Tab 4 at 000241.

In Paragraph 3.6 of the PRD, the Air Force disclosed:

> It is contemplated that this contract will grow to meet dynamic mission changes over the potential life of the contract. The estimated CMEs reflected in Appendix A serve as a benchmark for estimating workload growth of approximately 100%.

AR, Tab 4 at 000241.

**The LOS Clause**

The RFP incorporated by reference FAR 52.219-14, "Limitations on Subcontracting," which provided:

> (b) By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for --

> (1) Services (except construction). At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern [submitting the proposal].

AR, Tab 4 at 000179.

**<u>Section L</u>**

Paragraph 2.2 of Section L of the RFP instructed offerors to prepare their proposals as follows:

> Demonstrate your firm has the management and technical capability to successfully support the ARDTEAS Program. Detail shall be sufficient to allow the Government to evaluate the suitability of the organization to perform the services requested by Appendix A of the Performance Requirements Document (PRD), including your capability to rapidly "right size" to meet mission requirements.

AR, Tab 4 at 000200. Paragraph 2.2.3 of Section L defined "right size" as an offeror's ability to "expand and contract resources" through the "use of regular, temporary, corporate, subcontract, etc., personnel, and overtime, to meet workload increases for short and long term durations" and by using methodologies capable of "reduc[ing] personnel when notified of short and long term workload decreases." AR, Tab 4 at 000201.

In Paragraph 4.1.1 of Section L, the Air Force instructed offerors that their cost proposals were to be based upon a projected workload:

> 4.1.1 Cost/Price Reasonableness and Realism
> These instructions are for submitting information other than cost or pricing data required to evaluate the reasonableness and realism of your proposed cost/price. The proposed costs are to be for PRD Appendix A projected workload only. No other workload has been projected at this time.

AR, Tab 4 at 000208.

In documentation supplementing the RFP the Air Force provided a salary model containing direct labor rates but did not dictate either the total staff size or require a particular distribution by labor category. AR, Tab 232 at 018980-9021. Paragraphs 2.2.1 and 2.2.4 of Section L provided that no names or resumes of potential employees could be cited in the proposal. AR, Tab 4 at 000200-01. The Air Force also included the following disclaimer in its RFP:

> The Government is releasing the incumbent SE/TA contractor, TYBRIN corporation, expected 1 Oct 05 average direct labor rates and corresponding labor category definitions and fringe benefit package with the release of the ARDTEAS RFP

(FA9300-04-R-0040) for informational purposes only. Release of this information does not imply any expectations on the part of the Government for its use in proposal preparation, nor is the Government liable for its accuracy.

AR, Tab 232 at 018980.

**Section M**

The RFP advised offerors that proposals would be evaluated against four factors. The first three factors -- Mission Capability, Proposal Risk, and Past Performance -- were accorded equal importance, and were significantly more important than the fourth factor -- Cost/Price. AR, Tab 4 at 000214. Compliance with the LOS clause was not expressly listed in section M of the RFP as an evaluation factor for award.

The RFP stated that the total evaluated price would include the fixed-price-award-fee phase-in price and all cost-plus-award-fee labor for the base and option periods. Paragraph 7.3 of the RFP required a cost realism analysis for all cost-plus-award-fee services and required the Air Force to calculate a probable cost based on the offerors' FPRs. AR, Tab 4 at 000222. The RFP stated the probable cost would be used for the best value determination. AR, Tab 4 at 000222.

**The Air Force's Policy Memorandum**

The Air Force disclosed to offerors that it would interpret the LOS clause in accordance with its Air Force Policy Memorandum 2004-PK-007. AR, Tab 77 at 003711; Tr. (Sept. 11, 2007) at 39. Prior to issuing its RFP on February 28, 2005, the Air Force communicated its requirements to prospective offerors through an early exchange of information program and electronic library. AR, Tab 77 at 003662-4720. On or around August 20, 2004, the Air Force electronically provided its Policy Memorandum to offerors stating:

> 1. FAR Clause 52.219-14, Limitations on Subcontracting (Dec. 1996), which applies to 8(a) and small business set-aside contracts, states the small business prime contractor must perform specified minimum amounts of work, when the contract has been set aside for 8(a) or small business. The 13 CFR 125.6(g)[6] offers a valid

---

[6] 13 C.F.R. § 125.6, "Prime contractor performance requirements (limitations on subcontracting)," provides in pertinent part:

> (a) In order to be awarded a full or partial small business set-aside contract, an 8(a) contract, or an unrestricted procurement where a concern has claimed a 10 percent small disadvantaged business (SDB) price evaluation preference, a small business concern must agree that:
> (1) In the case of a contract for services (except construction), the concern will perform at

> interpretation and allows the minimum amounts of work to be performed by formal and informal joint ventures. The context and history of the entire 13 CFR 125 and 103 coverage of this matter provide for a reasonable interpretation of "informal joint venture" to mean a prime contractor and its subcontractors when the contract is reserved for 8(a) or small business. . . .
>
> 2. Accordingly, within AFMC, we interpret the clause 52.219-14 to mean that the minimum amounts of work can be performed by the collective efforts of either small business members of a formal joint venture or a small business prime contractor together with the first tier small business subcontractor(s), when the circumstances outlined in attachment 1 are present.

AR, Tab 137 at 016983.[7]

**<u>Centech's Proposal</u>**

Centech proposed to subcontract the work to **[** **]** a large business, **[** **]** a small business. AR, Tab 12 at 001144-46. Centech's proposal included **[** **]** experienced personnel, software tools, and past performance. AR, Tab 12 at 001087-1112. Centech's **[**

---

least 50 percent of the cost of the contract incurred for personnel with its own employees.

[7] Attachment 1 of the Policy Memorandum stated:

> We interpret that teams formed with prime contractor and subcontractor relationships are included in the CFR's use of the sentence "A joint venture may or may not be in the form of a separate legal entity" i.e., an informal joint venture. Prime-subcontractor teams may be a mix of large business and small business subcontractors but the performance of work requirements must be met by the cooperative efforts of the small prime contractor and the small business members of the subcontractor group. Therefore, the performance of work requirements (i.e., limitation of subcontracting) apply to the cooperative efforts of either a formal joint venture which is classified as a small business or a small business prime contractor and its small first tier subcontractors . . .

AR, Tab 137 at 016987.

] AR, Tab 12 at 001155-67, 001192-1228, 001322-28. Centech's proposal reflected that its employees would be assigned to [ ] different labor classifications and that the employees of its subcontractors would be assigned to [ ] different labor classifications, including acquisition managers, budget analysts, environmental engineers, system engineers, and other technically skilled specialties.

Centech relied on the Policy Memorandum in structuring its proposed cost/price model. AR, Tab 138 at 016992; Tab 264 at 019889. Centech's initial proposal reflected that it would perform less than 50 percent of the cost of contract performance with Centech employees. Centech estimated that the total labor cost for its own employees over the course of the contract would be [ ], and that the total labor costs for its subcontractors would be [ ]. AR, Tab 12 at 001161. Centech's final proposal revision (FPR) reflected prime contract labor costs of [ ]. AR, Tab 81 at 004914. Centech's revised FPR reflected [ ]. AR, Tab 81 at 004914.

Centech's proposal further stated: "Centech has not taken any exceptions to the ground rules or assumptions provided in the solicitation. We have not made any qualifications or conditional assumptions when preparing the Cost/Price volume. We have not requested, nor do we seek, any deviations from the terms and conditions of the solicitation document." AR, Tab 12 at 001151.

**Other Proposals**

In addition to Centech, three other offerors -- Tybrin, [ ] -- submitted proposals. Tybrin and [ ] proposed to perform over 50 percent of the labor costs themselves. AR, Tab 82 at 005078, 005122. Like Centech, [ ] proposed to perform less than 50 percent of the labor costs itself -- approximately [ ] percent. AR, Tab 81 at 004989; Tab 82 at 005143.

**The Evaluation and Award**

The four small business concerns who submitted proposals were included in the competitive range. AR, Tab 83 at 005169. The Air Force conducted discussions with offerors from September 6 through December 1, 2005. During discussions with Centech, the Air Force did not question Centech's ability or commitment to comply with FAR 52.219-14. AR, Tab 48-66.

Offerors submitted FPRs on or about December 15, 2005, and revised Cost/Price FPRs on or about February 22, 2006. On April 28, 2006, the Source Selection Authority (SSA) determined that the proposal submitted by Centech was the best value for the Air Force and awarded the contract to Centech. AR, Tab 83 at 005168; Tab 272 at 020285-322. The four proposals were evaluated against four factors. The first three factors -- Mission Capability, Proposal Risk, and Past Performance -- were accorded equal importance, and were significantly more important than the fourth factor -- Cost/Price. AR, Tab 4 at 000214. After evaluating the four proposals, the SSA found Centech and Tybrin to be the two highest rated offerors. The Source Selection Evaluation

Team (SSET) concluded that **[ ]**, Tybrin was stronger with respect to past performance, that these factors were of equal importance, and that there **[ ]**. AR, Tab 83 at 005167.[8] Although Tybrin's price was slightly lower, the SSA considered the cost differential to be insignificant.

Centech's awarded contract incorporated the LOS clause, FAR 52.219-14, by reference and authorized the Air Force to terminate the contract for convenience. AR, Tab 272 at 020312-314; see FAR 52.249-2, Termination for Convenience of the Government (Fixed Price), and FAR 52.249-6, Termination (Cost Reimbursement). Under this contract, the phase-in was to begin on May 1, 2006, and full performance was to begin on August 1, 2006. AR, Tab 267 at 019914.

**Tybrin's GAO Protest of the Award to Centech**

On May 26, 2006, Tybrin protested the Centech award to GAO. AR, Tab 3 at 000107. Among other things, Tybrin claimed that the Air Force failed to evaluate proposals in accordance with the RFP's stated evaluation criteria, failed to conduct meaningful discussions, and failed to conduct a proper best value determination. AR, Tab 3 at 000113-25, 000143-44.

On June 29, 2006, Tybrin filed a supplemental protest with GAO, claiming that the Air Force's interpretation of FAR Clause 52.219-14 "Limitations on Subcontracting" was incorrect, and that the Air Force should have disqualified Centech's proposal for noncompliance with this clause. AR, Tab 133 at 016955-60.

On July 10, 2006, the Air Force responded to Tybrin's Supplemental Protest and conceded that under Centech's proposal, only 43.2 percent of the cost of contract performance would be provided by Centech personnel. AR, Tab 131 016933-39; Tab 132 at 016941-54. The Air Force contended Centech's proposed use of subcontractors complied with the LOS clause as interpreted by the Policy Memorandum, because the collective efforts of Centech and its small business subcontractors would exceed 50 percent of the cost of contract performance for personnel. AR, Tab 131 at 016934; see also AR, Tab 132 at 016944.

**GAO Review and Request for SBA Advice**

In considering Tybrin's supplemental protest, GAO requested the views of the Small Business Administration (SBA) on the Limitations on Subcontracting clause. On August 2, 2006, the SBA rendered an opinion to GAO, concluding that the Air Force's interpretation of FAR clause 52.219-14 was incorrect, and advised GAO that the SBA possessed the exclusive jurisdiction to determine Centech's compliance with FAR Clause 52.219-14 under its COC Program. AR, Tab 146 at 017226. SBA advised that contrary to the Air Force's Policy Memorandum, "in general, a small business receiving a prime contract award as a result of a solicitation set aside for SBCs must meet

---

[8] The Air Force cited **[ ]** expertise, past performance, and tools as strengths of Centech's proposal. AR, Tab 81 at 004877-919.

the subcontracting limitation set forth in statute and regulations itself." AR, Tab 146 at 017227. The SBA stated:

> In the present case, we do not have a complete record to determine whether or not CENTECH and its small business subcontractors have an informal or formal joint venture relationship . . . Nonetheless, we believe that this is not an issue to be resolved in the course of a GAO protest, but is to be resolved in a COC ["Certificate of Competency"] proceeding. The Small Business Act provides in pertinent part that SBA is empowered, whenever it determines such action is necessary:
>
>> to certify to Government procurement officers, . . . with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract. A Government procurement officer . . . may not, for any reason specified in the preceding sentence, preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a final disposition to the Administration.

AR, Tab 146 at 017226.

On July 6, 2006, Tybrin filed its second supplemental protest, and on July 17, 2006, the Air Force responded. AR, Tab 169 at 017373-408; Tab 170 at 017410-36. On July 14, 2006, Tybrin filed its third supplemental protest with GAO, alleging that (1) the program manager of the SSET was biased against Tybrin, (2) the Air Force had failed to conduct meaningful discussions with Tybrin, and (3) the Project Manager usurped the duties of the CO and excluded the CO from critical activities in violation of the FAR. AR, Tab 173 at 017466-89.

On August 4, 2006, the Air Force stayed performance of Centech's contract so it could reconsider whether Centech met the standards of the RFP. AR, Tab 147 at 017230. On the same day, GAO dismissed all of Tybrin's protests as academic. AR, Tab 148 at 017233-34.

On August 10, 2006, the Air Force rescinded the Policy Memorandum. AR, Tab 249 at 019706-07. On August 17, 2006, Centech sent a letter to the Contracting Officer providing additional information to show that it performed in excess of 51 percent of the cost of personnel under the contract. AR, Tab 149 at 017236-90. The letter acknowledged that Centech's proposal had disclosed that "it would perform 42.3 percent of the total cost of contract personnel with its own employees." AR, Tab 149 at 017236. Centech explained that this was consistent with the Air Force's disclosure in the Policy Memorandum, but stated:

> Since submitting our proposal however, Centech has updated its cost model to reflect actual performance data, as opposed to estimated data. Based on the actual data, (actual salary and distribution data), Centech will perform **[ ]** of the total contract cost of personnel.

AR, Tab 149 at 017236. Centech updated its cost model based on new data it received during the 30 days of phase-in at Edwards Air Force Base by interviewing all incumbent personnel and obtaining actual salaries and labor categories for the incumbent staff. AR, Tab 187 at 017798; Tab 191 at 017964.

**The Air Force's Determination that Centech Lacked Responsibility and Referral to SBA**

On September 6, 2006, the Air Force issued a determination of nonresponsibility, stating that based solely on the information received from Centech with its proposal, Centech would perform only 43.2 percent of the work with its own personnel. AR, Tab 151 at 017296. On September 8, 2006, the Air Force rescinded Centech's contract based on the Air Force's conclusion that Centech had not proposed to perform 50 percent of the cost of labor with Centech's own employees. AR, Tab 152 at 017298. The Air Force asked Centech to extend the validity of its proposal until December 31, 2006. AR, Tab 152 at 017298.

On September 15, 2006, the Air Force referred the matter of Centech's responsibility to the SBA under the SBA's COC procedures. AR, Tab 154 at 017304. The Air Force's referral stated the "Centech Group did not meet the subcontracting limitation requirements set forth in statute and regulation . . . ." AR, Tab 154 at 017305.

Centech filed an agency protest on September 18, 2006, challenging the rescission of its contract and the refusal of the Contracting Officer to consider the new information it had submitted to establish its responsibility. AR, Tab 155 at 017308-15.[9]

**The COC Proceeding at SBA**

On September 19, 2006, the SBA notified Centech that it could appeal the Air Force's determination of nonresponsibility under the COC program. AR, Tab 186 at 017573. On September 28, 2006, Centech submitted an application for a COC. AR, Tab 194 at 018040-83. The next day, Centech responded to an SBA request for information by providing a chart that showed how it would meet the subcontracting limitation, noting that "[t]he figures disclosed in the chart below, are based on Air Force guidance provided during the post-award phase-in. . . ." AR, Tab 189 at 017954; see also AR, Tab 191 at 017964-68. Among the attachments to this letter were the Teaming Agreements. AR, Tab 189 at 017954; see AR, Tab 192 at 17988-8031. Centech advised the SBA that it had relied upon the Policy Memorandum in proposing to perform 43.2 percent of the contract

---

[9] The protest was dismissed on December 21, 2006, after the Air Force reinstated Centech's contract. AR, Tab 164 at 017354.

costs of personnel with its own employees, but now "will perform **[ ]** of the total contract costs of personnel required with its own employees (as opposed to the 43.2% figure Centech disclosed in its proposal based on its estimate of the USAF's actual contract requirements)." AR, Tab 191 at 017967. Centech updated this information on October 31, 2006. AR, Tab 187 at 017802-16.

In the COC proceeding, Centech submitted to the SBA documents not included in Centech's proposal such as narratives, a compliance matrix and spreadsheets, which purported to show that Centech would comply with requirements of the LOS clause. AR, Tab 158 at 017330; Tr. (Sept. 11, 2007) at 41; Pl.'s Memo. in Support of Mot. for Prelim. and Permanent Inj. at 25 ("Centech submitted to the Contracting Officer its cost estimating model provided with its original proposal updated to reflect actual contract performance data."). SBA determined Centech to be a responsible offeror and issued a COC to Centech. AR, Tab 158 at 017327, 017330; Tab 255 at 019794, n.3.

In issuing the COC, SBA reasoned as follows:

> In the original submission of bid information against what was required by the solicitation, we feel the Air Force encouraged an Informal Joint Venture to Centech in which combined labor between the prime and the subcontractors would meet the Limitations of Subcontracting Requirement. This of course was interpreted this way and considered the relaxed version of the rules based on a SADBU memorandum published by the Air Force. With the number submitted, all agree that the Centech Group's numbers were around 42% with information provided during original proposal with an anticipation of meeting the Limitations of Subcontracting Rules once the firm had the actual work and labor requirements of the contract.
>
> With the labor model utilized by the Air Force, we find it to be hypothetical and arbitrary with establishing the percent of labor that the firm proposed to perform with its own employees with its original submission. We find that it was stated as an intention by the Centech Group during the original proposal to meet the formal requirement of the Limitation of Subcontracting in being able to show it was doing at least 50% of the work with its own labor and management with burdened labor. This would occur once they had actual labor figures and tasks to work with. This was in-spite of what the Air Force encouraged utilizing an informal Joint Venture as interpreted. The firm had also stated this in their subcontracting arrangements.
>
> Labor is now being submitted with the same subcontractors with a more precise breakdown of costs based on a more in-depth investigation and new information. Labor charts reflect that the firm is now doing approximately **[ ]** with its own labor and management [personnel] based on estimation of numbers for [work] performed.

> This is still not totally accurate as they do not have actual labor information based on job requirements due to the competitive nature of the solicitation, however they have a better understanding of what is required and have had more time to evaluate. [Their] numbers will increase once they have actual labor figures to work with utilizing incumbent management and employees encouraged by the Air Force. As previously stated, we find that the firm did not change its subcontractors, only a better portrayal of actual numbers of what would be required in performing on this type of contract. They are now meeting the "Limitations of Subcontracting" regulation being able to perform with its own management and labor more than 50% without any Informal Joint Venture arrangement.

AR, Tab 158 at 017330.

To increase its percentage of personnel costs, Centech's SBA submission changed its previously proposed mix of prime and subcontractor full-time equivalents (FTE), labor classifications and skill levels. Specifically, Centech's SBA submission **[ ]** proposed **[ ]** and **[ ]**. AR, Tab 187 at 017812. **[ ]**. AR, Tab 12 at 001155, 001157, 001194, 001322.[10] **[ ]**. AR, Tab 12 at 001155, 001157, 001194, 001322. Centech's SBA submission made **[ ]** of the 48 labor classifications and **[ ]**. AR, Tab 187 at 017812.[11] In these post-FPR changes submitted by Centech to the SBA in an effort to comply with the LOS clause, **[ ]** from **[ ]** to **[ ]**, and **[ ]** from **[ ]** to **[ ]**. AR, Tab 81 at 004914; Tab 187 at 017800.[12]

---

[10] **[ ]** AR, Tab 247 at 019682-83; Tab 276 at 020356-57.

[11] **[ ]** Level III, **[ ]** Level II, and **[ ]** Level I, but its submission to the SBA altered those proposed levels to **[ ]** employees, **[ ]**. AR, Tab at 187 at 017812.

[12] Charles L. Bonuccelli, a consultant and principal of Argy, Wiltse & Robinson, P.C., compared the labor rates Centech provided to the SBA with the labor rates Centech proposed in its revised FPR. Decl. of Charles L. Bonuccelli (Feb. 15, 2007), AR, Tab 247 at 019687-88. Mr.

The following chart reflects the changes in the percentage of personnel costs before and after the FPR due date for CENTECH and its subcontractors:

| | CENTECH | [ ] | [ ] | [ ] |
|---|---|---|---|---|
| Air Force calculated FPR percentage[13] | 43.2% | [ ] | [ ] | [ ] |
| CENTECH post-FPR changes[14] | [ ] | [ ] | [ ] | [ ] |

The SBA made a formal size determination that Centech was a small business on November 13, 2006, and on December 4, 2006, certified that Centech possessed the responsibility to perform the contract. AR, Tab 158 at 017328-31; Tab 189 at 017945-52.

**The Air Force's Reinstatement of the Award to Centech**

On December 21, 2006, the Air Force reinstated the award to Centech based on the SBA's issuance of the COC. AR, Tab 161 at 017339.

**Tybrin's GAO Protest Against the Reinstatement of Centech's Award**

On December 29, 2006, Tybrin filed a GAO protest against the Air Force's December 21, 2006 reinstatement of the award to Centech. Tybrin claimed that Centech's proposal, on its face, indicated Centech had not offered to comply with the subcontracting limitation. AR, Tab 145 at 017082.

On February 2, 2007, Tybrin filed a supplemental protest based on documents it received in its GAO protest which Centech had submitted to the SBA in conjunction with the COC proceeding. AR, Tab 255 at 019794, n.3. Tybrin protested that Centech improperly changed its proposal after the RFP due date, contrary to FAR 15.306 and 15.307. See AR, Tab 255 at 019794, n.3, 019796, n.4.

**GAO's Decision Sustaining Tybrin's Protest**

On March 13, 2007, GAO sustained Tybrin's protest, stating that Centech's proposal could

Bonuccelli testified that the reclassification of prime and subcontractor labor classifications and skill levels reflected in Centech's SBA submission significantly changed the prime and subcontractor labor costs of its proposal, [ ]. Id. at 019688.

[13] AR, Tab 132 at 016944.

[14] AR, Tab 187 at 017803.

not form the basis of an award because the Air Force determined that the proposal on its face failed to comply with a material term of the solicitation, the LOS clause. AR, Tab 255 at 019788. GAO concluded that because Centech's proposal provided that only 43.2 percent of the cost of personnel would be expended for Centech employees, the Air Force should have evaluated Centech's proposal as unacceptable instead of referring the matter to the SBA for a COC determination. AR, Tab 255 at 019795.

GAO acknowledged that Centech had relied upon the flawed Air Force Policy Memo and stated:

> While we find that CENTECH's proposal could not form the basis for award under this RFP, the record reflects that CENTECH submitted its proposal with the understanding that it would be found to meet or exceed the subcontracting limitation requirement, given the AFMC memorandum that allowed for the performance of work requirement imposed by the Limitation on Subcontracting clause to be met by the "cooperative efforts" of CENTECH and its small business subcontractors. Additionally, although discussions were held with the four offerors that had submitted proposals, the matter of CENTECH's proposal's compliance with the requirements of the Limitation on Subcontracting clause was never raised with CENTECH during discussions because of the Air Force's reliance on the AFMC memorandum. Accordingly, CENTECH was deprived of meaningful discussions regarding its proposal's failure to comply with the requirements of the Limitation on Subcontracting clause . . . We recommended that the Air Force reopen discussions and request and review revised proposals, evaluate those submissions consistent with the terms of the solicitation, and make a new source selection decision.

AR, Tab 255 at 019796 (citations omitted).

In a footnote, GAO stated:

> Because we sustain TYBRIN's protest and recommend the reopening of discussions, we need not resolve TYBRIN's allegations regarding the evaluation of its and CENTECH's proposals and the selection of CENTECH's proposal for award, or its allegations that the evaluation evidences bias against TYBRIN, that CENTECH has an organizational conflict of interest that renders it ineligible for award, that CENTECH was improperly permitted by the SBA to alter its proposal and status after the agency had received and evaluated the offerors' proposal revisions, or that the Air Force had deprived TYBRIN of meaningful discussions. However, as the Air Force

> proceeds with its corrective action, it may want to be mindful of the issues raised by TYBRIN in its protests, including TYBRIN's assertion that the agency failed to adequately consider potential organizational conflicts of interest related to **[ ]**. (one of [CENTECH's] proposed subcontractors).

AR, Tab 255 at 019796, n. 4.

On March 23, 2007, the SBA requested reconsideration of the GAO decision. On April 17, 2007, GAO denied the SBA's request for reconsideration. AR, Tab 256 at 019798-801.

**<u>The Air Force's Actions In Response to the GAO Decision</u>**

The Air Force acted on the GAO's suggestion in footnote 4 that it be "mindful" of the issues raised in Tybrin's protests as it proceeded with corrective action. AR, Tab 268 at 019933-37. The Air Force decided to assemble a new SSET with new members. AR, Tab 268 at 019933. After discussing twenty-five "main protest issues," during an ARDTEAS Steering Group meeting in April 2007, the Air Force decided to issue an amendment to the RFP, as well as update the Source Selection Plan and Acquisition Strategy Panel/Acquisition Plan. AR, Tab 268 at 019937.[15]

**<u>Amendment 3</u>**

On June 29, 2007, the Air Force issued Amendment 3 to the solicitation stating in pertinent part:

---

[15] In a Memorandum For Record dated May 25, 2007, the Air Force documented its considerations in fashioning corrective action. AR, Tab 266 at 019898-99; <u>see also</u> AR, Tab 267 at 019900-32. According to this Memorandum, the Air Force rejected an option of allowing only two out of four offerors the opportunity to restructure their proposals because that would open the door for them "to enhance their proposals with new technologies and processes that [could] be tied to new or revised teaming relationships." AR, Tab 266 at 019898; <u>see also</u> AR, Tab 267 at 019919. The Air Force concluded that denying the other two offerors the same opportunity would "not promote a fair environment." AR, Tab 266 at 019898. Therefore, the Air Force decided to allow all offerors in the competitive range to restructure their proposals in light of the corrected interpretation of the LOS clause. AR, Tab 266 at 019898. The Air Force also rejected an option of starting over with a new solicitation because all offerors had been included in the competitive range, and no other firms had indicated interest in the procurement. AR, Tab 266 at 019898.

In a Memorandum For Record dated June 8, 2007, the Air Force documented the changes it deemed necessary to the RFP because of the passage of time, concluding that the performance period would be moved out, the terms and conditions would be updated, the PRD would be revised, and information regarding the Flight Test Center and incumbent contract would be refreshed. AR, Tab 265 at 019895-97.

1. The subject amendment is issued in response to the GAO recommendation to re-open discussions with all offerors while mindful of their other comments as a result of GAO's 13 Mar 07 decision sustaining the protest with regards to the government's interpretation of the Limitations on Subcontracting clause as it related to proposal evaluations. Due to the length of time that has elapsed since the RFP was issued and proposals were received and evaluated, this amendment updates the RFP and requests offerors to submit updated proposals. The passage of time has made it necessary to appoint a new evaluation team that will conduct a complete evaluation of all updated proposals. The new teams will not have access to the previous proposals nor the former evaluations conducted.

2. The Air Force is mindful that subcontractor relationships may have changed in this interval as well as other time sensitive aspects of an offeror's proposal. Offerors are therefore requested to revive their proposals and make any needed changes in response to the updates/changes in the RFP or as a result of correctly interpreting the Limitations on Subcontracting clause. . . .

a. Be mindful that FAR 52.219-8, Utilization of Small Business Concerns, is applicable to your proposal. (See Section L, paragraph 3.7.4 & Section M, paragraph 6.2.3)[16]

. . . .

3. AFMC Policy Memo 2004-PK-007, dated 19 Aug 2004, titled "Limitations on Subcontracting, FAR Clause 52.219-14 (Dec 1996)" has been rescinded. Compliance with FAR 52.219-14 Limitations on Subcontracting, dated Dec 1996, as written is required, which requires of the prime contractor/concern that ". . .at least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." Proposals must comply with this requirement in order to be eligible for award.

4. The revised period of performance for the ARDTEAS contract

---

[16] Section M, paragraph 6.2.3, Performance Quality Assessment, of the solicitation states in part "[t]he Government will consider the performance quality of recent relevant contracts assessed . . . . Pursuant to DFARS 215.305(a)2, the assessment will consider the extent to which the offerors past performance demonstrates compliance with FAR 52.219-8, Utilization of Small Business Concerns." AR, Tab 4 at 000220.

> consists of an 8 month Basic Period from 1 Feb 08 through 30 Sep 08 (includes 90 day Phase-In) and 12 one-year option periods coinciding with the Government fiscal years of FY 2009 through FY 2020.
>
> 5. The ARDTEAS RFP has been updated due to the passage of time since it was first issued. The updates will ensure consistency and relevancy of data submitted. Some of the key updates are as follows:
>
> a. Schedule B has been updated to reflect the revised period of performance. . . .
>
> b. The clauses included in all sections of the RFP have been updated to reflect what is required under the current FAR, DFARS, AFFARS and the AFMCFARS. . . .
>
> c. The Performance Requirements Document (PRD) has been updated due to the passage of time. *You are advised to review the PRD in its entirety*. . . .
>
> . . . .
>
> 6. Please ensure your ORCA certifications and representations are current. In addition, a new Section K must be submitted in Volume 4 of your updated proposal.
>
> 7. A complete Organizational Conflict of Interest (OCI) Mitigation Plan must be submitted with your updated proposal. If your original plan does not need to be updated, please resubmit your original plan.

AR, Tab 257 at 19803-05.[17]

In Amendment 3 the Air Force also addressed the issues raised in Tybrin's protests. AR, Tab 264 at 019889-94. A new SSET was appointed, and the new team will conduct a new evaluation on the revised proposals without any input from the original team. AR, Tab 264 at 019889.

---

[17] In a Memorandum for Record, issued the same day as Amendment 3, the Air Force explained its basis for this corrective action, citing GAO's recommendation and its intent to give the two offerors that had relied upon the Policy Memorandum the opportunity to restructure their proposals to comply them into compliance with FAR 52.219-14 and allow all offerors to update their proposals. AR, Tab 264 at 019889-94; Tab 267 at 019907, 019918.

## Discussion

### Standard for Resolving Motions for Judgment on the Administrative Record

As the Federal Circuit explained in Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005), when resolving motions for judgment on the administrative record the Court must make factual findings based upon the administrative record. In response to Bannum and to distinguish motions for judgment on the administrative record from motions for summary judgment, this Court adopted new Rule 52.1, effective June 20, 2006, to govern proceedings on actions for review of the administrative record. See RCFC 52.1. The Rules Committee explained the rationale for RCFC 52.1 as follows:

> The rule replaces an earlier rule, RCFC 56.1, that applied certain standards borrowed from the procedure for summary judgment to review of an agency decision on the basis of an administrative record. That incorporation proved to be confusing in practice because only a portion of the summary judgment standards were borrowed. Summary judgment standards are not pertinent to judicial review upon an administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005). Specifically, the now repealed Rule 56.1 did not adopt the overall standard that summary judgment might be appropriate where there were no genuine issues of material fact. See RCFC 56(c).

RCFC 52.1 (Rules Committee Note). The Rules of the United States Court of Federal Claims and the Court's jurisdictional statute, 28 U.S.C. § 1491(b)(3), indicate that the procedure for resolving motions for judgment on the administrative record entails an expedited trial on the record. Bannum, 404 F.3d at 1355-56; Forest City Military Communities v. United States, No. 07-546C (Fed. Cl. Nov. 19, 2007).

### Standard of Review

The Court's role in a bid protest is to assess whether the agency's procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The fact that an agency procurement action was taken as corrective action resulting from a GAO bid protest does not alter this landscape or immunize the agency action from judicial review. The Court of Federal Claims possesses jurisdiction to determine if a corrective action taken by an agency in response to a bid protest was reasonable under the circumstances. Chapman Law Firm v. United States, 490 F.3d 934, 938 (Fed. Cir. 2007); see also Honeywell Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (presuming the court's jurisdiction to review corrective action and stating "a procurement agency's decision to follow the Comptroller General's recommendation . . . was proper unless the Comptroller General's decision itself was irrational").

In order to prevail under the APA standard, Centech must demonstrate either that the agency

corrective action constituted a clear violation of applicable statutes or regulations, or that the Air Force acted arbitrarily and capriciously in following GAO's decision because GAO's decision was itself irrational. See Honeywell, 870 F.2d at 648; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001); see also Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004). If Centech meets this initial burden, it then must also show that it will suffer prejudice as a result of the proposed corrective action. Bannum, 404 F.3d at 1351, 1353-54.

**Standards for Injunctive Relief**

Plaintiff asks this Court to reinstate its original award and declare that the Air Force's decision to follow GAO's recommendation and take corrective action was arbitrary, capricious and an abuse of discretion. Specifically, Plaintiff asks the Court to enjoin the Air Force from expending any funds for the subject services except under the contract originally awarded to Centech. To obtain a permanent injunction, a party must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest. Gentex Corp. v. United States, 58 Fed. Cl. 634, 654 (2003) (citing Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 320-21 (2000); see also Hawpe Constr., Inc. v. United States, 46 Fed. Cl. 571, 582 (2000) aff'd, 10 Fed. Appx. 957 (Fed. Cir. 2001)).

**Success on the Merits: Was the Air Force's Corrective Action Taken Pursuant to GAO's Recommendation Reasonable?**

In deciding whether an agency was justified in following a GAO recommendation, this Court determines whether GAO's decision was rational. The Court's review is not de novo. Honeywell, 870 F.2d at 648. In this procurement, the Air Force has taken corrective action based upon GAO's determination that Centech's proposal was unacceptable because it failed to meet the LOS clause. GAO recognized that the Air Force had erroneously informed offerors that they could meet the LOS clause on a collective basis and that the Air Force's mistaken guidance had led Centech and another offeror to submit proposals which did not comply with the clause. As a result, GAO recommended reopening discussions to permit all offerors to submit revised proposals based upon a correct interpretation of the LOS clause. In addition, because over two years had passed since the original RFP was issued, the Air Force invited updates to proposals and endeavored to revise its evaluation procedures to meet other allegations in Tybrin's GAO protest.[18]

The LOS clause incorporated into the solicitation required an offeror to perform at least 50

---

[18] GAO did not resolve Tybrin's numerous other allegations regarding the evaluation and award, but GAO did state that as the Air Force proceeds with its corrective action, it might want to be mindful of the issues raised by Tybrin in its protest, including Tybrin's assertion that the agency failed to adequately consider potential organizational conflicts of interest. AR, Tab 255 at 019796, n.4.

percent of the contract costs with its own personnel.[19] Plaintiff contends that GAO's conclusion that its proposal was unacceptable was wrong because compliance with the LOS clause was not required to be evaluated as a condition for award, but instead should have been examined after award, once the Air Force's actual requirements were defined and the costs of performance of the labor by the prime and subcontractors could be ascertained. Under Plaintiff's theory, its representation in its proposal that it would perform only 43.2 percent of the labor costs itself did not render its proposal unacceptable because its failure to meet that clause was not a failure to meet a mandatory, material requirement of the solicitation, but was a matter of post-award contract administration. Thus, in Plaintiff's view, its original contract award should be reinstated.

Plaintiff's theory cannot succeed here for two reasons. First, the Small Business Act, 15 U.S.C. § 644(o), provides that a concern may not be awarded a contract as a small business unless it agrees that at least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern.[20] The Small Business Act, 15 U.S.C. § 644(o), plainly requires the small business prime contractor to agree to perform at least 50 percent of the cost of personnel with its own personnel. It is undisputed that Centech's proposal, on its face, did not do that. As such, Centech's proposal violated the mandate of the Small Business Act, which makes the prime contractor's agreement to perform 50 percent of the labor costs itself a prerequisite to obtaining the award. See Transatlantic Lines LLC v. United States, 68 Fed. Cl. 48, 52 (2005) ("a contractor awarded a small business set-aside contract for services must show that it will incur at least fifty percent of its labor costs on the contract from its own employees").

Secondly, GAO correctly determined that Centech's proposal was unacceptable because it failed to comply with the LOS clause -- a mandatory, material solicitation requirement. Plaintiff contends that because compliance with the LOS clause was not expressly stated in Section M as an evaluation factor for award, it was not a mandatory requirement, and the clause could be satisfied post award as a matter of contract administration. However, under the terms of the solicitation, the

---

[19] FAR 52.219-14(b) provides in pertinent part:

By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for–

(1) Services (except construction). At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern.

[20] 15 U.S.C. § 644(o) provides in pertinent part:

> (1) A concern may not be awarded a contract under subsection (a) of this section as a small business concern unless the concern agrees that –
>
> (A) in the case of a contract for services (except construction), at least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern.

percentage of labor costs performed by a prime versus a subcontractor impacted an offeror's proposed bottom-line costs, and costs were to be evaluated based upon the model in the RFP.[21] Because the mix of prime-subcontractor labor here affected the cost evaluation, compliance with the LOS clause had to be evidenced in offerors' proposals. As such, the LOS clause was implicated in the evaluation and was not simply a matter of post-award contract administration. As the Court in Blount, Inc. v. United States, 22 Cl. Ct. 221, 228 (1990) recognized:

> In requiring the contractor to self-perform 20 percent of the work under the contract, the clause directly impacted bid price. The self-performance requirement limited the amount of work which could be subcontracted under the contract. A contractor can generally achieve considerable savings by subcontracting work to firms with lower cost structures who are capable of performing the project with less expense. As such, a contractor may gain a sizeable bid pricing advantage by subcontracting more work than its competitors . . . Since compliance with the "Performance of Work" clause invariably affected bid price, the "Performance of Work" clause constitutes a material term of the IFB. Vanderbilt Shirt Co., 69 Comp. Gen. 20 (1989).[22]

Because Centech's proposal did not comply with both a mandatory statutory requisite for award and a material solicitation provision which impacted offerors' evaluated costs, the proposal, as GAO held, was technically unacceptable and ineligible for award. Chapman, 63 Fed. Cl. at 527 (stating that "a proposal that fails to conform to a material term and condition of the solicitation,

---

[21] The impact that compliance with the LOS clause had on cost here is illustrated by Centech's actions in this procurement. The post-FPR changes submitted by Centech to the SBA in an effort to comply with the LOS clause resulted in a significant change in the mix of prime and subcontractor labor costs as compared to Centech's initial proposal and FPRs. [ ] AR, Tab 81 at 004914; Tab 187 at 017800. [ ] AR, Tab 187 at 017812.

[22] In Blount, the court cited an affidavit supplied by the intervenor for the proposition that cost savings could be achieved by subcontracting. There is similar testimony by a consultant in the instant case. Decl. of Charles L. Bonuccelli (Feb. 15, 2007), AR, Tab 247 at 019687-88. Regardless of the weight accorded to that declaration, which was submitted by Tybrin in the GAO protest, it is clear that compliance with the LOS clause here not only had an impact on proposed costs but also on the categories and skill levels of personnel offered.

such as the subcontracting limitation, is unacceptable and may not form the basis for an award").[23]

Centech further contends that it deserves its original award because it could and would actually meet the LOS clause post-award -- as determined by the SBA's responsibility assessment, which used different prime-sub labor mixes and costs than those evaluated. The problem with this argument is that Centech would not in fact be receiving award based upon its original proposal or the original solicitation.[24] The original solicitation, evaluation and award were premised on legal error -- that a small business could meet the LOS clause collectively with its subcontractors. As such, that original award is illegal, void ab initio and a nullity, and cannot be reinstated by the Court. Nor can Centech with a wink and a nod alter its proposal after the evaluation during a responsibility assessment to change a material proposal term, recognizing that it had to meet the 50 percent requirement itself. FAR 15.305(a); see also Prestex Inc. v. United States, 320 F.2d 367, 372 (Ct. Cl. 1963).

To allow Centech alone to alter its offer by changing the proposed labor mix and percentage of costs it would incur for its own personnel to be above 50 percent would change the ground rules for Centech but not other offerors.[25] This would violate fundamental tenets of procurement law requiring that offerors submit proposals to the same requirements and be evaluated against those same requirements.

In sum, Centech has not demonstrated that the Air Force's corrective action was arbitrary, capricious, or an abuse of discretion. As such, Centech cannot meet the first requisite for injunctive relief. Because Centech has not demonstrated success on the merits, the Court need not examine the other factors for injunctive relief. Forest City, No. 07-546C (Fed. Cl. Nov. 19, 2007), slip op. at 43; Info. Tech. & Applications Corp. v. United States, 51 Fed. Cl. 340, 357 n.32 (2001), aff'd, 316 F.3d 1312 (Fed. Cir. 2003) ("Absent success on the merits, the other factors are irrelevant."). Nonetheless, it is clear on this record that Centech is not entitled to the injunctive relief it seeks -- reinstatement of its erroneous original award -- relief which would merely reinstate and perpetuate an illegality.

---

[23] The fact that elsewhere in its proposal Centech generally stated that it took no exception to the requirements of the solicitation does not alter this result. Centech's specific delineation of its proposed costs, allocated among itself as the prime and its three subcontractors, trumps its generalized statement that it took no exception to the solicitation requirements.

[24] Centech's requested reinstatement of its original award could no longer be made pursuant to the original solicitation which incorporated the erroneous Air Force advice since the Policy Memo has since been rescinded. Instead, Centech's requested relief would be a directed award made sub silentio under a different, proper interpretation of the LOS clause to a different, corrected proposal.

[25] Centech in the COC proceeding, was no longer bidding on the same projected workload all other offerors had bid on -- it was using a different assumption -- actual workload data it gleaned later.

**Remand**

Centech's inability to secure an injunction does not end the matter. The Air Force has confessed error to having issued a flawed solicitation, erroneously interpreting the LOS requirement. Because Centech relied on this erroneous advice in submitting its offer, it may be entitled to an award of some portion of its bid and proposal preparation costs if it can show such costs were wasted. Given the present posture of the Air Force's corrective action -- an ongoing reevaluation in which Centech is participating, the Court remands this matter to the Air Force. RCFC 52.2(a); Emerald Coast Finest Produce Co., Inc. v. United States, 75 Fed. Cl. 549, 555 (2007); Knowledge Connections, Inc. v. United States, 76 Fed. Cl. 612, 615-16 (2007).[26] Because the Air Force will not be able to ascertain Centech's entitlement to bid and proposal preparation costs until after its new award is made in or before April 2008, the Court does not prescribe that the Air Force complete its proceedings on remand within 180 days from the date of this order, as is normally required under RCFC 52.2(a)(2)(B). Rather, the Air Force shall complete its determination on remand within 180 days of its new award determination.[27]

**Conclusion**

1. Defendant's and Intervenor's Motions for Judgment on the Administrative Record are granted in part in that the Court upholds the Air Force's corrective action and denies Plaintiff's request for injunctive and declaratory relief.

2. Plaintiff's Motion for Judgment on the Administrative Record is granted in part as to Plaintiff's claim for bid and proposal preparation costs, which is remanded to the Air Force for its determination, consistent with this opinion. Plaintiff's motion is denied in all other respects. Plaintiff's motion for a permanent injunction is denied.

3. On remand, the Air Force's determination of Centech's entitlement to bid and proposal preparation costs shall be completed within 180 days of the date of a new final award in the subject procurement. RCFC 52.2(a). Given this remand, the Clerk of Court shall serve a certified copy of this opinion and order on agency counsel for the Air Force:

---

[26] Counsel for Defendant requested during oral argument that the Air Force be permitted to consider Centech's entitlement to bid and proposal preparation costs in the first instance. Plaintiff agreed with this approach. The Court grants this request, recognizing that the Air Force will await the outcome of its reevaluation before determining whether reimbursement of such costs is appropriate.

[27] The Clerk of the Court need not transmit the Administrative Record in this protest to the Department of Justice as normally required by RCFC 52.2(a)(4), as the record to be developed for a potential award of bid and proposal preparation costs necessarily will be a different record -- including Centech's documented and supported costs and any appropriate audit or review by the Government.

John G. Terrra
Trial Attorney
U.S. Air Force Legal Operations Agency
Commercial Litigation Division
1501 Wilson Boulevard, Room 606
Arlington, VA 22209

4. This action is stayed pending the Air Force's determination of Centech's entitlement to bid and proposal preparation costs. Defendant shall file a status report on or before **May 1, 2008.**

5. This decision is issued under seal. The parties shall file any proposed redactions by **December 12, 2007**. The party proposing a redaction has the burden of establishing that the proposed redacted material is protected.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**